IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LESTER LAMAR GRANT,              )
                                 )
            Plaintiff,           )
                                 )
     v.                          )   CIVIL ACTION NO. 2:14cv654-CSC
                                 )              (WO)
CAROLYN W. COLVIN,               )
Acting Commissioner of Social Security,[1]  )
                                 )
            Defendant.           )

**MEMORANDUM OPINION and ORDER**

**I.  Introduction**

On April 26, 2007, the plaintiff applied for supplemental security income benefits under

Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and disability insurance benefits

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*., alleging that he was

unable to work because of a disability.  His application was denied at the initial administrative

level.  The plaintiff then requested and received a hearing before an Administrative Law Judge

("ALJ").  Following the hearing, the ALJ also denied the claim.  The Appeals Council rejected

a subsequent request for review.  (R. 13).

On September 23, 2009, the plaintiff filed a second application which was approved on

December 12, 2009.  (*Id*.).  The Appeals Council then consolidated the two applications, and,

on June 1, 2011, remanded the claims to reconcile the denial of the first application with the

approval of the second application regarding whether the plaintiff meets the requirements of

_____

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.

Listing 12.05, Mental Retardation.[2]  (R.180-82).  Following a hearing in August 2012, the ALJ

concluded that Grant does not meet Listing 2.05 and denied the claim.  (R. 13-24).  The Appeals

Council rejected a subsequent request for review.  (R. 10).  The ALJ's decision consequently

became the final decision of the Commissioner of Social Security (Commissioner).[3]  *See*

*Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and

1383(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have

consented to a United States Magistrate Judge conducting all proceedings in this case and

ordering the entry of final judgment.  Based on the court's review of the record in this case and

the briefs of the parties, the court concludes that the decision of the Commissioner should be

reversed and remanded with instructions that benefits be awarded.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically determinable
> physical or mental impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period of not less than 12
> months.

---

[2]  "The 2013 version of the Listing of Impairments replaced the term 'Mental Retardation' with 'Intellectual Disability.'"  *T.R.C. ex rel. v. Comm'r*, --- Fed.Appx. ----, 2014 WL 292286 at *3 n.2 (11th Cir. 2014).  However, the parties refer to Grant's intellectual disability as mental retardation.

[3]  Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

To make this determination[4] the Commissioner employs a five step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[5]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007). "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th  Cir. 2004).  A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take into

---

[4]   A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[5]  *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

account evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986). The court "may not decide the facts anew, reweigh the evidence, or substitute . . . [its] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (alteration in original) (quotation marks omitted).

> [The court must, however,] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## III.  The Issues

**A. Introduction.**  Grant was 32 years old at the time of the last hearing before the ALJ. (R. 37). He has completed the tenth grade in special education classes.[6] (*Id.*). Grant's prior work experience includes work as a lumbar stacker, material stacker (sod stacker) and poultry dresser. (R. 23). Following the administrative hearing, the ALJ concluded that Grant has severe impairments of "borderline intellectual functioning, depressive disorder and migraines." (R. 16). The ALJ concluded that Grant was unable to return to his past relevant work. (R. 23). However, the ALJ concluded that Grant has the residual functional capacity to perform other jobs that exist in significant numbers in the national economy, and thus, he is not disabled. (R. 23-24).

---

[6] Grant's school records indicate that he was special education classes at least from 1996 until 1999. (R. 586). He was scheduled to receive a graduation certificate, not a high school diploma. (R. 545-86). Grant indicated to Dr. Peggy Thornton, a licensed psychologist, that he started in special education classes in the second grade. (R. 662).

**B. The Plaintiff's Claims.**  As stated by the plaintiff, Grant presents four issues for the Court's review.

1.    Whether the ALJ failed to properly consider Mr. Grant's back and neck pain at step two or beyond in the sequential evaluation process.

2.    Whether the ALJ failed to properly consider the opinion of Dr. Shack.

3     Whether the ALJ substituted his opinion for that of Dr. Lopez in finding that the record does not support a diagnosis of a psychotic disorder.

4.    Whether the ALJ erred by applying an innaccurate (sic) standard of law in evaluating whether Mr. Grant meets or equals Listing 12.05.

(Doc. # 14, Pl's Br. at 1).

## IV.  Discussion

This court's ultimate inquiry is whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad.  *Id*.  The regulations also make the nature of the SSA proceedings quite clear.  They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."  20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

The ALJ must also state, with sufficient specificity, the reasons for his decision

referencing the plaintiff's impairments.

> *Any* such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual *shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.*

42 U.S.C. § 405(b)(1) (emphases added).

The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992). When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion or record over another. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981).[7] Because the court finds that the ALJ erred as a matter of law by failing to follow the correct legal standards in evaluating whether Grant's intellectual impairment met Listing 12.05C, the court pretermits discussion Grant's remaining issues.

At step three of the sequential evaluation process, the ALJ is required to determine whether the claimant's impairments meet or equal one of the specific impairments set forth in

---

[7]  *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

20 C.F.R. Pt. 404, Subpt. P, App. 1. *See McDaniel*, 800 F.2d at 1030. "The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings." 20 C.F.R. Pt. 404, Subpt. P. App. 1, 12.00 MENTAL DISORDERS.

> To meet listing 12.05 ("intellectual disability"), a "claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton*, 120 F.3d at 1219. These requirements are referred to as the listing's "diagnostic criteria." *See* 20 C.F.R. pt. 404, subpt. P., app. 1, § 12.00 ("Listing 12.05 contains an introductory paragraph with the diagnostic description for [intellectual disability].") In addition to satisfying the diagnostic criteria, a claimant must meet one of the four severity requirements in paragraphs A through D of the listing. *See id.* § 12.05. Under paragraph C, the only paragraph at issue here, a claimant must show that [he] has both "[a] valid, verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

*Frame v. Comm'r, Soc. Sec. Admin.*, — F. App'x —, 2015 WL 150733, *2 (11th Cir. 2015) (No. 13-15347).

> Listing 12.05 then specifically addresses the impairment of intellectual disability.

> 12.05 *Intellectual disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> . . . .

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpart P, App. 1, Listing 12.05C.

Consequently, "a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid IQ score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities." *See Monroe v. Comm'r of Soc. Sec.*, 504 F. App'x 808, 810 (11th Cir. 2013) *quoting Lowery v. Sullivan*, 979 F.2d 835 (11th Cir. 1992). *See also Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985).

After thoroughly reviewing the record, the court concludes that the ALJ's determination that Grant does not meet Listing 12.05C is not supported by substantial evidence. School records indicate that, on December 15, 1992, Grant was administrated the Wechsler Intelligence Scale for Children - Revised ("WISC-R"), and he scored a verbal IQ of 51, a performance IQ of 57, and a full scale IQ of 50. (R. 554). On July 24, 1995, and December 15, 1995, Grant's WISC-R scores were again noted as verbal IQ of 51, performance IQ of 57, and full scale IQ of 50. (R. 545, 581). On May 21, 1996, it was noted that Grant had a full scale IQ score of 50. (R. 553). In 1992, 1996 and 1997, Grant's school records reflect a primary diagnosis of mental retardation. (R. 554, 584-85). When Grant was in the tenth grade, in special education classes, he was reading *on or below* kindergarten level and performing math on the second grade level. (R. 566) (emphasis added). Grant was in a graduation certificate program in special education classes. (R. 575-76).

On April 17, 2009, Dr. Peggy Thornton, a consultative licensed psychologist, conducted a psychological evaluation of Grant and tested his intellectual functioning. (R. 662-66.) On the Wechsler Adult Intelligence Scale - Third Edition ("WAIS-III") test, Grant achieved a verbal

8

IQ of 68, a performance IQ of 69, and a full scale IQ of 66.  (R. 663).  Dr. Thornton noted that

Grant "gave a good effort and all environmental requirements were met. However, supportive

school records and other test results were not available.  Therefore, his scores are deemed to be

provisionally valid."  (R.664).  Dr. Thornton concluded that the intellectual assessment

indicated Grant was functioning in the "Extremely Low Range of Intellectual Functioning,

Provisional." (*Id*.).  She opined that he would be unable to manage benefits "due to poor math

skills," but he would be able to make appropriate work decisions "in unskilled-type jobs." (*Id*.).

On November 18, 2009, Dr. John Gam, a consultative licensed psychologist, conducted

a psychological evaluation of Grant at the request of the Commissioner.  (R. 809-12).  Dr. Gam

noted that Grant's IQ "has been tested and is in the Extremely Low range."  (R. 809).  Although

Dr. Gam noted that Grant was "working towards getting his GED," he also noted that Grant

*does not read*.  (R. 810) (emphasis added).  Dr. Gam  suggested that "it is not likely that he will

get his GED."  (R.811).  Dr. Gam's examination revealed the following:

> **COGNITION AND SENSORIUM**:  He is alert and oriented to time, place,
> person, and situation.  His thought process is slow but orderly.  His thought
> content is centered around his inability to work due to his temper problems.
> **SPEECH**:  *His speech is slow, halting, with limited vocabulary*.  No motor
> deficits have been noted.  There are no indications of florid psychotic symptoms
> such as hallucinations, delusions, tangentiality, derealization, and
> depersonalization. **MOOD**:  His affect is somewhat blunted.  His mood is
> perplexed and depressed, dysphoric.  **INTELLECT**:  *His intellect is impaired*.
> His knowledge of current events is marginal.  He correctly identifies Mr. Obama
> as the current president of the United States and Mr. Bush as the immediate past
> president.  He is unable to name the current governor of Alabama.  He has no
> concept of current world events.  **MEMORY/CONCENTRATION**: His recent
> memory, concentration, and attention span are impaired.  He fails to recall any of
> the three objects out of the three after five minutes.  He recites four digits forward
> and two digits backwards.  He completes no units in the Letter-Number

Sequencing tasks.  **CALCULATIONS**:  His ability for simple calculation is marginal.  He counts backwards from 100, slowly.  He fails to perform serial three additions and serial four subtractions.  **ABSTRACTION**:  His ability for abstraction is poor.  He is unable to interpret the Rolling Stone, Strike Iron, and Glass Houses proverbs.  As far as identification of similarities between different objects is concerned, the patient explains that a dog and a lion are alike in that they are like cats.  An orange and a banana are alike in that they are both fruit.  A boat and an automobile are alike in that they are cars.  **INSIGHT AND JUDGMENT**:  His insight and judgment are concrete.  He explains that when one first sees fire or smoke in a theater he should run.  Many foods need to be cooked because they are eggs.  Some drugs require a doctor's prescription to get the right drug.

(R. 810-11) (italicized emphasis added).

Dr. Gam opined that Grant's level of motivation was low but "[h]e does not appear to be antagonistic or suspicious.  His social skills are poor.  There are no indications of malingering."  (R.811).  Finally, Dr. Gam suggested that Grant's "long history of mental slowness" would preclude him from functioning independently. (R.811).

Finally, Dr. David Ghostley, a licensed clinical psychologist, conducted a third psychological evaluation of Grant on August17, 2011. (R. 831-33).  Dr. Ghostley noted that Grant completed the 11th grade but "[n]otably, no school records were made available for review.  Mr. Grant claims that he was enrolled in special education classes for slow learners." (R. 831).  Dr. Ghostley administered to Grant the Wechsler Adult Intelligence Scale - Fourth Edition ("WAIS-IV") test.  (R. 832).  He achieved a full scale IQ of 62.  (*Id*.).  With no explanation at all, Dr. Ghostley opined

The results of WAIS-IV cognitive testing indicate Mr. Grant functions in the Mild Range of Mental Retardation.  However, Mr. Grant's level of adaptive behavior is estimated to be such that a diagnosis of Mild Mental Retardation would be ruled out in favor of Borderline Intellectual Functioning.

(*Id*.)

Again, without explanation, Dr. Ghostley concluded that "Mr. Grant's ability to function independently and manage finances is considered unimpaired, given his history. Otherwise, his ability to understand, remember and carry out simply instructions, as well as respond appropriately to supervisors, co-workers, and work pressures in a work setting, is generally unimpaired." (R.833).

It is clear that none of the psychologists had access to Grant's school records which demonstrate that as a child, Grant had IQ scores that fall within the range of mental retardation. (R.553-584). For example, as early as 1992, Grant had a full scale IQ score of 50, a performance IQ score of 57 and a verbal IQ score of 51. (R. 554). His school records consistently reflect a primary diagnosis of mental retardation. (R. 584-85). "Mental retardation is not normally a condition that improves as an affected person ages. . . . Rather a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.'" *Hodges*, 276 F.3d at 1268-69 (quoting *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001)). Given that Dr. Thornton's determination was provisional because she lacked Grant's school records and Dr. Ghostley commented on the lack of school records to support Grant's claim that he was enrolled in special education classes, it is probable that information concerning Grant's prior diagnosis of mental retardation, his similar IQ scores as a child, and documentation indicating Grant attended special education classes throughout most of his schooling would have assisted the psychologists in assessing Grant's intelligence level. *Cf. Lowery*, *supra* (recognizing that a claimant's attendance in special education classes and

11

evidence that the claimant read at a third grade level while in junior high were consistent with a longstanding deficit in intellectual performance).

The Commissioner argues that the ALJ's determination that Grant does not meet Listing 12.05C is supported by substantial evidence because Grant does not have a diagnosis of mental retardation and he has "substantial adaptive functioning." First, Listing 12.05C does not require a *diagnosis* of mental retardation; rather, it requires a "valid verbal, performance, or full scale IQ of 60 through 70." Grant's test results fall within the parameters of Listing 12.05C. Thus, the plaintiff plainly has the requisite IQ score to meet the first prong of the listing.[8]

More importantly, however, the ALJ applied an inproper legal standard when determining whether Grant meets the requirements of Listing 12.05C. The ALJ found that Grant does not meet Listing 12.05(C) based on his level of adaptive functioning.

> The Claimant also does not meet the requirements set forth in section 12.05C despite having IQ scores between 60 and 70 (Ex. 7F). Although the Claimant has the requisite IQ scores, the Claimant's level of adaptive functioning demonstrates the Claimant is far more capable than what is represented by the IQ scores. The Claimant is able to speak clearly and uses a cell phone. The Claimant regularly visits with friends (Ex. 17F). Dr. Ghostley observed the Claimant was fully independent in performing daily activities (Id). The Claimant is the payee for his disability benefits and has also stated he can manage his own money that he receives from the Administration, and he has his own checking account (Exs. 15E and 15F). The Claimant has stated he can perform all aspects of home care as he cleans, does laundry, works in the yard, and buys groceries (Ex. 15F). While the Claimant initially stated he was not able to cook, he later told Dr. Gam that he is able to cook (Ex. 15F). The Claimant has indicated that he attends church and

---

[8] Because Grant presented valid IQ scores between 60 and 70, he is entitled to a presumption that the disability onset occurred before the age of 22. *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001) ("[A]bsent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout [the claimant's] life."). Grant's school records support the conclusion that he has suffered from mild mental retardation long before he reached age 22.

goes to the movies (Exs. 6E and 19F).  The Claimant also testified that he goes out with his brother in an effort to date women. The evidence shows the Claimant also had a romantic relationship with a woman during the alleged period of disability. The Claimant seems to be able to act upon his own initiative.  He testified he keeps a calendar in his room to track his appointments.  The Claimant is very knowledgeable about cars, and the evidence shows he has bought and sold multiple cars during the alleged period of disability (Ex. 19F).  While the Claimant claims he is afraid to drive, the Claimant drove himself to the hearing officer, which is located seventy miles away from his home.  The Claimant is able to shop by himself (Ex. 15F).  The Claimant enjoys going to the movies, joy riding, attending sporting events, and date (Ex. 6E).  The Claimant has worked in several semi-skilled jobs at SGA levels, as noted below.  The skills required for those jobs also indicate the Claimant is more capable than what is reflected by the Claimant's IQ scores.  Moreover, a recent treatment report indicated the Claimant did not have a cognitive impairment, which further indicates the Claimant does not have mild mental retardation. (Ex. 19F).

The evidence about in nine of the ten areas related to adaptive functioning shows the Claimant's functional abilities are greater than his IQ scores.  However, the Claimant's formal academic training is consistent with his IQ scores.  His educational records show the Claimant was enrolled in special education and that he did not complete school (Ex. 14E).While the Claimant  has repeatedly mentioned that he wanted to obtain his GED, the Claimant has  not completed the program (Ex. 19F).

At hearing, the medical expert concluded that the claimant also had adaptive functioning.  He based his opinion on the claimant's various IQ testing, the subsequent evaluations discussed herein, the claimant's noted adaptive living skills discussed above, and perhaps most importantly, the total absence of any Axis II diagnosis of mild mental retardation by his treating mental health care providers, Spectracare (Id.).

Finally, Dr. Ghostley estimated that the Claimant's level of adaptive behavior is such that a diagnosis of mild mental retardation is ruled out in favor of borderline intellectual functioning (Ex. 17F).  Therefore, in light of the overwhelming evidence showing the Claimant has substantial adaptive functioning, the Claimant does not meet the requirements contained in section 12.05C.

(R. 18-19).

The ALJ concluded that Grant does not meet or equal the criteria of Listing 12.05C not

because he does not have the requisite deficits in adaptive functioning but rather because he has some adaptive functioning.  (R. 18-19).  Stated another way, the ALJ did not consider whether Grant had the requisite deficits in adaptive functioning. Instead, the ALJ concluded that because Grant had some functioning, he did not meet the Listing.[9]  According to the ALJ, because Grant is able to use a cell phone, listen to the radio, and visit with a friend, he cannot possibly meet the Listing for Intellectual Disability regardless of his IQ scores.  Taking that reasoning to its logical conclusion, only claimants suffering from mental retardation and who have no functioning capacity at all would be able to demonstrate that he or she meets the Listing for

---

[9]  The colloquy between the ALJ and Grant's attorney at the administrative hearing supports the court's conclusion that the ALJ applied the incorrect legal standard in this matter.  *See Grant v. Astrue*, 255 F. App'x 374, 375 (11th Cir. 2007) (the ALJ "applied an improper legal standard . . . by requiring [the claimant] to demonstrate deficits in more than one area of adaptive functioning before the age of 22.").

> ALJ:     Yeah.  That – and that may be where I, I, I don't necessarily think the case law shows that.  I think what you look at, you look at ten areas, ten specific areas from social to communication to scholastic work to work history and so forth.  You look at all those.  You look at those ten areas.  You have to have at least two that are substantially below the mean in, in – of those ten areas.  My, my real question to you, the first one, was dealing with the prelude to 12.05.

> ATTY: Yes, sir.

> ALJ:     I believe the way this is interpreted and, some circuits may differ, but *I believe the way this is interpreted is you have to have significantly subaverage adaptive functioning, deficits in adaptive functioning and then you almost insure the words that are right before the word initially*.  There –

> *          *          *

> ALJ:     . . . In other words, can your adaptive functioning improve over time such that sure, you rang the bell back when you were under 22, but now you've gotten skilled work, you've gotten your – everything's going for you.  You got all ten of those areas, you're, you're doing well.  You may have deficits, but *they're not significantly subaverge*.

(R. 109-110).

mental retardation.  This is simply incorrect as a matter of law.

The law in this Circuit holds that a claimant "meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid IQ score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities."  *See Monroe*, 504 F. App'x at 810 *quoting Lowery, supra*; *Harris*, 330 F. App'x at 815.  *See also Edwards*, 755 F.2d at 1517.  The ALJ concluded, and the Commissioner does not dispute, that Grant also suffers from depressive disorder and migraine headaches.  (R. 16).  Both conditions have more than a "minimal effect" on Grant's ability to perform work.  Consequently, Grant meets the requirements of Listing 12.05C, and the ALJ erred as a matter of law when he applied the incorrect legal standard in ascertaining whether Grant meets Listing 12.05C.

The Listing's plain language requires Grant to demonstrate some *deficits* in adaptive functioning to meet the Listing, and the court concludes that he has done so.  He cannot live independently.  He cannot read or do simple math.  He cannot cook. He cannot get alone with others.  He has slow speech with a limited vocabulary.  Grant has demonstrated that he suffers from the requisite deficits in adaptive functioning necessary to meet the Listing.

In addition to applying the incorrect legal standard, the ALJ erred by culling the record for selective references, and ignoring comments that did not support his conclusions.  For example, the ALJ found, based on Dr. Ghostley's report, that Grant was "fully independent in performing daily activities." (R. 18).  He ignores, however, Dr. Ghostley's comment that Grant "now lives with his brother," and Grant's testimony that he does not drive by himself, he does

15

not own a car, he does not shop on his own, and although he has a checking account, he goes into the bank to get money.  (R. 47, 58, 68,70, 516, 590).  Grant further testified that he does not write checks on the account, but that his sister writes any checks. (R.145, 590).  Grant further testified that he cannot read or do math, and his school records reflect that he reads at or below kindergarten level and does math at the second grade level.  Although Grant indicated that he takes care of his dogs, he also indicated that the "[w]hole family helps with [the] dogs." (R. 588). Grant does not cook because he is "afraid of the stove since childhood accident."[10] (R. 589).  On his adult function report, Grant indicated that he does light house work and yard work but explained that it takes him an hour to clean his room or rake the yard. (R. 589).  It is undisputed that Grant lives with his brother, and there is no indication that he has ever lived independently.  The ALJ also ignores the opinion of Dr. Thornton that Grant's intellectual abilities are in the "extremely low range" and that he could not manage his benefits.  (R. 664).  The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion. *Marbury*, 957 F.2d at 840-84.

Relying on treatment records from SpectraCare, the ALJ found that Grant "is very knowledgeable about cars, and the evidence shows he has bought and sold multiple cars during the alleged period of disability (Exhibit 19F)."  (R. 18).  The ALJ's interpretation of the treatment notes is disingenuous at best.  On September 13, 2011, Grant commented in group

---

[10] In his first daily activities questionnaire dated June 11, 2007, Grant indicated that he cannot cook. (R. 515).

therapy that "he has no reliable transportation to pursue his GED, goal 3 is on hold."[11]  (R. 852).

On November 8, 2011, Linda Dudewicz, a licensed social worker, made the following notation.

> Lester has had two claims filed with Social Security.  One in 2007 and one in 2009.  He just received a Medicare card.  Feb 2010 he started receiving SSD benefits but is not able to tell me what he receives.  His 2007 claim is pending for his attorney is trying to get back pay for him based on his 2009 claim being approved.  I suspect his brother is his payee and this is why he has so much anger towards him. He was quite upset over getting another "lemon" for a vehicle.  He has put money into a used truck and plans on selling it for parts and start anew. He discussed wanting to relocate to Phenix City whenever he gets awarded back money.  He keeps headaches and has anger towards his brother. Little insight into his illness, goal 1.  No progress on goal 2 or 3.

(R. 853).

In January 2012, Grant reported wanting to "pay off his car and become independent living (sic)."  (R. 854).  On February 14, 2012, Grant was excited about having a new girlfriend but he planned on living with his brother "until he can get his car paid off." (R. 856). Finally, on April 4, 2012, Grant reported that he had reliable transportation and "he has left women alone and has put his energy into Kingdom Hall."  (R. 857).  This evidence does not support the ALJ's conclusion that Grant is "very knowledgeable about cars . . . and bought and sold multiple cars."  While the ALJ is entitled to make findings of fact, he cannot create facts out of whole cloth.

The ALJ also found that Grant was "able to act upon his own initiative" because he keeps a calendar with appointments in his room. (R. 18).  This finding is speculative and unsupported

---

[11]  The court is baffled by the apparent willingness of the social worker and the ALJ to assume that Grant should be able to get his GED, in light of his IQ scores and the uncontroverted evidence that he is unable to read or do math, and he was educated in special education classes.

by substantial evidence because the undisputed evidence demonstrates that Grant cannot read which would make it difficult to record or track appointments on a calendar. Finally, the ALJ relied on a treatment report that "indicated the Claimant did not have a cognitive impairment, which further indicates the Claimant does not have mild mental retardation (Ex.19F)." (R. 19). The ALJ is simply wrong. The court has scoured Grant's treatment records from SpectraCare (Ex. 19F) and has found no such notation about Grant's cognitive abilities.

The ALJ also relied on Grant's prior work experience in several "semi-skilled" jobs to conclude that he has a level of adaptive functioning. The record simply does not support the ALJ's conclusion that  Grant's prior work constituted semi-skilled work, particularly in light of the ALJ's colloquy with the vocational expert.

Q      Dr. Sweeney?

A      Okay.  I, I got these from the – reviewing the electronic file and also listening to the testimony and, and, and questioning about yourself.  So I, I, I find that he's worked as a stock clerk, DOT describes this as heavy work and semiskilled at a SVP: 4.  I do believe from his description, and this was dated in the electronic file, he likely performed this only at a medium level, not heavy.

Q      Okay

A      The, the <u>DOT</u> is 299.367-014.[12]

---

[12]  The Dictionary of Occupational Titles defines the duties of a stock clerk, position 299.367-014, as follows:

Inventories, stores, prices, and restocks merchandise displays in retail store: Takes inventory or examines merchandise to identify items to be reordered or replenished. Requisitions merchandise from supplier based on available space, merchandise on hand, customer demand, or advertised specials. Receives, opens, and unpacks cartons or crates of merchandise, checking invoice against items received. Stamps, attaches, or changes price tags on merchandise, referring to price list. Stocks storage areas and displays with new or

Q      And that's the Walmart job that you're assessing?

A      I believe – yes, sir.

Q      Okay.

A      At the veneer company, that would be a lumbar stacker and, again, it's described as heavy and unskilled at a SVP: 2.  However, when one looks carefully at what he said he had to lift and move and all that, again, this would be no more than medium as performed.  The <u>DOT</u> is 922.687-070.  Again, he tells us he was a shipping and receiving cler, <u>DOT</u> describes this as medium and skilled at a five level.  The five level attracted my attention, and based on everything else we know about the claimant, but just reporting the facts as presented it, it was – it's five as described.  The <u>DOT</u> is 222.387-050.[13]  And I believe, and this would be at the sod farm,

transferred merchandise. Sets up advertising signs and displays merchandise on shelves, counters, or tables to attract customers and promote sales. Cleans display cases, shelves, and aisles. May itemize and total customer merchandise selection at check out counter, using cash register, and accept cash or charge card for purchases. May pack customer purchases in bags or cartons. May transport packages to specified vehicle for customer.

It is completely unclear how the vocational expert concluded that Grant, who cannot read or do math, could perform duties that involve taking inventory, requisitioning merchandise, or checking invoices.

Moreover, although Grant identified his position as "shipping and receiving," it is clear from his testimony that Grant simply unloaded pallets from trucks and placed the pallets under or on shelves.  (R. 39, 45-46).

[13]   The Dictionary of Occupational Titles defines the duties of a shipping and receiving clerk, position 222.387-050, as follows:

Verifies and keeps records on incoming and outgoing shipments and prepares items for shipment: Compares identifying information and counts, weighs, or measures items of incoming and outgoing shipments to verify information against bills of lading, invoices, orders, or other records. Determines method of shipment, utilizing knowledge of shipping procedures, routes, and rates. Affixes shipping labels on packed cartons or stencils identifying shipping information on cartons, using stenciling equipment. Assembles wooden or cardboard containers or selects preassembled containers. Inserts items into containers, using spacers, fillers, and protective padding. Nails covers on wooden crates and binds containers with metal tape, using strapping machine. Stamps, stencils, or glues identifying information and shipping instructions onto crates or containers. Posts weights and shipping charges, and affixes postage. Unpacks and examines incoming shipments, rejects damaged items, records shortages, and corresponds with shipper to rectify damages and shortages. Routes items to departments. Examines outgoing shipments to ensure shipments meet

it's – I'm going to say that is material handler, because he was just really moving things, and specifically, material handler.  There's, there's nothing like a sod stacker or anything like that in <u>DOT</u>.  Now, this is described as heavy, and a SVP: 3, so semiskilled.  Again, when we look at what he said – when he got detailed, that would have been medium as performed in exertion.  The material handler <u>DOT</u> is 929.687.030.[14]  And this, this last

specifications. Maintains inventory of shipping materials and supplies. May operate tier-lift truck or use handtruck to move, convey, or hoist shipments from shipping-and-receiving platform to storage or work area. May direct others in preparing outgoing and receiving incoming shipments. May perform only shipping or receiving activities and be known as Shipping Clerk (clerical) or Receiving Clerk (clerical). May be designated according to specialty as Freight Clerk (clerical); Reshipping Clerk (clerical). May receive damaged or defective goods returned to establishment and be designated Returned-Goods Receiving Clerk (clerical). May receive unsold products returned by DRIVER, SALES ROUTE (retail trade; wholesale tr.) 292.353-010 and be designated Route Returner (clerical).

[14]    The Dictionary of Occupational Titles defines the duties of a material handler, position 929.687-030, as follows:

supply; loader and unloader; servicer; stacker; utility worker Loads, unloads, and moves materials within or near plant, yard, or work site, performing any combination of following duties: Reads work order or follows oral instructions to ascertain materials or containers to be moved. Opens containers, using steel cutters, crowbar, clawhammer, or other handtools. Loads and unloads materials onto or from pallets, trays, racks, and shelves by hand. Loads materials into vehicles and installs strapping, bracing, or padding to prevent shifting or damage in transit, using handtools. Conveys materials to or from storage or work sites to designated area, using handtruck, electric dolly, wheelbarrow, or other device. Secures lifting attachments to materials and conveys load to destination, using hand-operated crane or hoist, or signals crane or hoisting operators to move load to destination . . . . Counts, weighs, and records number of units of materials moved or handled on daily production sheet. Attaches identifying tags or labels to materials or marks information on cases, bales, or other containers. Loads truck for INDUSTRIAL-TRUCK OPERATOR (any industry) 921.683-050. Stacks or assembles materials into bundles and bands bundles together, using banding machine and clincher. Clamps sections of portable conveyor together or places conveyor sections on blocks or boxes to facilitate movement of materials or products. Removes samples of materials, labels with identifying information, and takes samples to laboratory for analysis [LABORATORY-SAMPLE CARRIER (any industry) 922.687-054]. Lifts heavy objects by hand or using power hoist, and cleans work area, machines, and equipment, using broom, rags, and cleaning compounds, to assist machine operators. Makes simple adjustments or repairs, such as realigning belts or replacing rollers, using handtools. Assembles crates to contain products, such as machines or vehicles, using handtools and precut lumber. Shovels loose materials, such as sand, gravel, metals, plastics, or chemicals, into machine hoppers or into vehicles and containers, such as wheelbarrows, scrap truck, or barrels. May occasionally operate industrial truck or electric hoist to assist in loading or moving materials and products. May be designated according to material handled as Filling

never came out in testimony, but he reports working in a – in the poultry industry for about six months and he, he wasn't specific about what he did, but knowing how those operations work, I can believe he was at the lower level, I mean, killing and dressing out chickens isn't too exciting. Poultry dresser is what we would call that. It is light work, chickens and all not being too big, light big and unskilled at SVP: 2. It's an entry level job in that industry. The <u>DOT</u> number for poultry dresser, 525.687-070. And I believe that pretty much covers –

*    *    *

Q    Dr. Sweeney, I had a question for you. I wanted to make sure I wasn't confusing jobs. You mentioned stock clerk as the first job and then the fourth – the third job you said was shipping and receiving. I wrote down shipping and receiving for what he did at Walmart in 2009. What was the stock clerk job? Was that the same thing we're talking about?

A    Well, you know, that – that's a good question and maybe I could use some help there. When I originally did the file and I, you know, I saw everything, there's not a whole lot of detail given, and I saw what it was he did an (sic) all. I said stock clerk, semiskilled at a 4. And I saw a reference to the shipping and receiving, but I, I saw that it was a 5, a skilled job? And I, and I wasn't sure that, that what he did was – that he became proficient at that level. But to be honest with you, so much was mentioned of it during the hearing and all, that I went ahead and kind of concession on my part, I said well, I really, I really better address that and we can sort it out later. So that – that's where I am. I'm kind of – wanted

---

Hauler, Weaving (textile); according to method of conveying materials as Lugger (agriculture); according to machine or equipment loaded or unloaded as Blunger Loader (pottery & porc.); Vehicle Unloader (any industry); or according to work station as Outside Trucker (any industry); Platform Loader (any industry). May be designated: Bale Piler (textile); Batch Trucker (rubber tire); Bobbin Handler (textile); Car Loader (any industry); Cloth Hauler (textile); Coal Passer (any industry); Compress Trucker (agriculture); Hogshead Dumper (tobacco); Kiln Car Unloader (brick & tile); Laborer, Yard (any industry); Loader (any industry) II; Lumber-Yard Worker (woodworking); Merchandise Carrier (any industry); Mold Mover (toy-sport equip.); Oven Stripper (any industry); Oven Unloader (any industry); Packaging-Machine-Supplies Distributor (tobacco); Slab Picker (saw. & plan.); Powder Trucker (chemical; ordnance); Rack Carrier (paper goods); Racker (any industry); Retort Loader (chemical); Roper (agriculture); Roving Stock Handler (textile); Scrap Wheeler (machine shop); Segregator (agriculture; wholesale tr.); Sugar Trucker (grain-feed mills); Tire Trucker (rubber tire); Trucker, Hand (any industry).

to cover all of the fronts.

Q   Okay.  I'm going to consider that the same.

A   It, it, it's at worst – or excuse me, at, at low as stock clerk, shipping and receiving at, at, at best because it's going to require some, you know, math – keeping records and that sort of  thing.

Q   Okay.

A   So I –and then let let's see, there – there's one other thing.  Let's see how long - oh, give, give me a minute here – just to look at one other thing.  Okay.  A 5, a 5 level proficiency <u>DOT</u> suggest – it, it, it's – again, it's, it's in the skilled realm at, at the – it's the lowest level of skilled, they're 5, 6 and on up, and it would take six months to  year to become proficient in it and says, says, that it requires complex skills and requires judgment. So I guess one of the questions is exactly how long did he do that and, and would we believe that he reached proficiency.

Q   Okay.

A   But that's really the issue, isn't it?   Again, I – without have a job description –

Q   Right.

A   – what he literally did on the – I, I – that's the best I could come up with.

ATTY:   I thought he said basically all he was doing was unloading the trucks really.  I mean, not really –

ALJ:   Yeah.  At Walmart?

ATTY:   – determine shipment.

ALJ:   I got the impression unloading trucks, putting it on a rack, and then getting –

VE:   What – yeah, he did say –

ALJ:   – back to the, to the back storage area –

22

ALJ:          Right, right, right.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        – and putting it on shelves.

A        Yeah, I did get the put on the shelves.  That, that wouldn't – that would convince me more that it was stock clerk.

Q        Okay.  Right.

A        So we – I, I can –

Q        Because I'm looking at the shipping and receiving clerk in the <u>DOT</u> and I mean there's a lot of, I mean, determining, determining proper shipments and – and all of that.

A        Well, that – that's one of the reasons why I shied away from it at first–

Q        Yeah. Right.

A        – but then I thought well, I, I really – it's been mentioned two or three times and discussed.  Judge, I wouldn't have any compunction about eliminating – withdrawing that as a, as a realistic job.

BY ADMINISTRATIVE JUDGE

Q        The stock clerk?

A        Yeah. The shipping and receiving.

Q        And, saying that it's stock  so I – I'd end up with stock clerk, again, at, at medium although it's, it's heavy as described.  Material handler, that was the sod, medium, although it's –

A        Okay.

Q        – it's described as heavy and then, the veneer stack or lumbar stacker, again is heavy and two. I would say medium and then, and then I'm a long shot on the poultry, because it really never came up in –

23

ATTY:          Testimony.  Right.

(R. 88 - 92).

Thus, the court concludes that the ALJ erred as a matter of law in concluding that Grant's previous work history demonstrates that he worked in several semi-skilled jobs.  Moreover, the ALJ does not explain how, if at all, Grant's prior work experience stacking veneer and sod or unloading trucks is inconsistent with mild mental retardation.[15]  *See generally Black v. Astrue*, 678  F.Supp.2d 1250 (N.D. Fla. 2010) (valid I.Q. scores between 60 and 70, special education classes, prior employment as a mushroom picker and reliance on family for help with complicated activities sufficient to demonstrate deficits in adaptive functioning manifested before age 22).

The ALJ further compounded his errors when he relied on Dr.Ghostley's opinion that Grant has "greater functional abilities" than suggested by the test results.  (R. 19).  According to Dr. Ghostley, "[t]he results of WAIS-IV cognitive testing indicate that Mr. Grant functions in the Mild Range of Mental Retardation. However, Mr. Grant's level of adaptive behavior is estimated to be such that a diagnosis of Mild Mental Retardation would be ruled out in favor of Borderline Intellectual Functioning."  (R. 832).  Beyond this conclusory statement, Dr. Ghostley offers no explanation and articulates no reasons for concluding that Grant is not

---

[15]   Of course, the mere fact that Grant held a job is, as a matter of law, insufficient to support a finding that he did not have deficits in adaptive functioning.  In *Ambers v. Heckler*, the court held that since Ambers met the Listing for mental retardation, "she is entitled to benefits regardless of the fact that she may be able to hold gainful employment as she did in the past."  736 F.2d 1467, 1468 (11th Cir. 1984).  *See also Powell v. Heckler*, 773 F.2d 1572, (11th Cir. 1985) (fact that claimant had worked intermittently during the period at issue is not sufficient justification to deny benefits.).

suffering from mild mental retardation.

Thus, the court concludes that the ALJ's determination that Grant did not meet Listing 12.05C because Grant has some adaptive functioning is erroneous as a matter of law.  Grant has valid IQ scores between 60 and 70.  He also suffers from severe impairments of depressive disorder and migraines which impose additional and significant work-related limitations of function.[16]  And, he has presented sufficient evidence that he manifested deficits in adaptive functioning before age 22.  Therefore, as a matter of law, Grant meets the requirements of Listing 12.05C.

Accordingly, the decision of the ALJ must be reversed because, in considering whether Grant had an impairment that met or medically equalled the listing for mental retardation found in Listing 12.05C, the ALJ failed to follow the applicable regulations and law, and did not base his findings on substantial evidence.  *Walker*, 826 F.2d at 999.  Further, because the evidence establishes that Grant does meet the requirements of Listing 12.05C, the case will be remanded with instructions that benefits be awarded.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (recognizing that reversal with award of benefits is appropriate where the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt"); *Ambers*, 736 F.2d at 1470 (holding that, if a claimant meets requirements of Listing 12.05C, "the claimant is determined disabled" at that

---

[16]  As a matter of law, for purposes of Listing 12.05C, an impairment other than intellectual disability imposes "an additional and significant work-related limitation of function" if that impairment qualifies as a severe impairment at step two of the sequential evaluation.  20 CFR Pt. 404, Subpart P, app. 1 § 12.00(A); 65 Fed. Reg. 50746, 507754 (Aug. 21, 2000).

point in the sequential analysis, and further consideration is unnecessary).

## V. Conclusion

Accordingly, this case will be reversed and remanded to the Commissioner and the case remanded to the Commissioner with instructions that benefits be awarded. A separate judgment will be entered.

Further, it is

**ORDERED** that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after he receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). *See also Blitch v. Astrue*, 261 F. App'x 241, 242 n.1 (11th Cir. 2008).

The Court will enter a separate final judgment.

Done this 24th day of September, 2015.

_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE